UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DUSTIN C. BRINK,

    Plaintiff,

v.                                                   Case No: 8:19-cv-2844-30AEP

DIRECT GENERAL INSURANCE
COMPANY,

    Defendant.

## **SUMMARY JUDGMENT ORDER**

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Dkt. 46) and Plaintiff's Response in Opposition (Dkt. 49). The Court, having reviewed the motion, response, record evidence, and being otherwise advised in the premises, concludes that the motion should be denied because the evidence—when viewed in a light most favorable to Plaintiff—is sufficient to support a jury verdict in his favor in this bad-faith insurance case.

## **FACTS**

The Court views the facts in a light most favorable to Plaintiff Dustin C. Brink, the non-movant. In the early morning hours of April 5, 2008, Juan Luiz Ruiz Pereles was driving a 2000 Mitsubishi motor vehicle that his father, Juan Ruiz De Los Santos, owned. The vehicle collided with a motorcycle that Brink was driving. Brink was seriously injured. At the time of the accident, Pereles and De Los Santos (collectively "insureds") were insured against liability claims arising out of the operation and use of the 2000

Mitsubishi under a policy of liability insurance issued by Defendant Direct General Insurance Company, having bodily injury liability limits of $10,000 per person, $20,000 per occurrence, and property damage liability limits of $10,000 per accident.

Direct General was notified of the accident on April 28, 2008, and spoke with its insureds that same day. After the conversation, Direct General noted that De Los Santos had difficulty speaking English. The record reflects that by April 30, 2008, Direct General was aware that Brink was in a coma from the accident. Also, by May 30, 2008, Direct General noted in its claims log that "since we have low limits (BI 10/20) and serious inj[ury,] liability will be non-issue," and the potential exposure to the insureds was in excess of the policy limits. (Dkt. 46-1 at DGIC 7534).

On August 4, 2008, attorney Alexander Clem sent Direct General a letter stating he was representing Brink in his claims against Direct General's insureds. (Dkt. 46-6). The letter requested that Direct General provide Clem with "all the items identified under [Fla. Stat. § 627.4137]," including "the statement of your insured or his agent." *Id*.

On August 18, 2008, Direct General sent a letter in English to De Los Santos requesting that he directly contact Clem and provide Clem with the requested statement regarding other insurance. (Dkt. 46-8). The letter did not advise that the value of Brink's claims was likely to exceed the policy limits, nor did it alert him that he would be responsible for any amounts in excess of the policy limits should the claim not settle.

Direct General also responded to Clem on August 18, 2008, enclosing an affidavit of coverage from a Direct General superintendent, as well as a copy of Direct General's August 18, 2008 letter to De Los Santos. Direct General's response to Clem did not

contain the statement from the insured or agent as requested in Clem's August 4, 2008 letter.

Direct General did not follow up on the August 18, 2008 letter to De Los Santos and this is the only letter Direct General wrote to its insureds for over nineteen months.

On August 19, 2008, Direct General made the decision to pay the BI policy limits to settle Brink's BI claim. From this time until almost the end of October 2008, Direct General called Clem and left him messages advising him that Direct General wanted to get things resolved.

On October 21, 2008, Direct General wrote Clem a letter expressing its intent to tender the full $10,000 BI limits to settle Brink's BI claim. The letter requested that Clem provide specific check instructions and his federal tax identification number so that Direct General could process payment of the claim. The letter also requested that Clem advise Direct General if Brink intended to pursue a PD claim.

On October 29, 2008, Direct General phoned Clem and left a message. On November 18, 2008, Direct General made three separate phone calls to Clem's office following-up on its offer to tender the full $10,000 BI limits. That same day, Direct General sent another letter to Clem, following up on the October 21, 2008 letter offering to tender the BI policy limits.

Having received no response from Clem, on November 21, 2008, Direct General wrote another letter to Clem that tendered the $10,000 BI policy limits to settle Brink's BI claim. The record reflects that Direct General continued to attempt to get in touch with Clem to no avail.

3

On June 26, 2009, Clem sent Direct General a letter requesting that Direct General "supplement [its] response to [the August 4, 2008] request for the disclosure of insurance information," specifically alerting Direct General that he "still [did] not have all the requested information in order to verify the amount of liability coverage available to [Direct General's] insureds." (Dkt. 46-19).

On July 30, 2009, Direct General responded to Clem's June 26, 2009 letter. Direct General provided the same disclosure it had previously provided in August 2008, i.e., the same disclosure that Clem indicated was incomplete. (Dkt. 46-23).

On November 10, 2009, Direct General reassigned the Brink claim to adjuster Sheila Moore, who was a member of the claims team supervised by Suzanne Watkins.

On February 19, 2010, Clem sent a time limit demand to Direct General advising that Brink was "now ready to resolve his claims" within the policy limits. (Dkt. 46-25). In the letter, Clem alerted Direct General that he still had not received a statement from the insured or agent regarding other insurance, and also outlined release language he required before the claims could settle. The letter then stated: "If I receive that release and the requested insurance disclosure documentation in the next couple of weeks with all insurance proceeds offered by your company, then my client will sign the release." *Id.*

On February 26, 2010, Moore told Direct General's correspondence unit that she did not want an insurance disclosure completed in response to Clem's demand.

After about three weeks passed with no response and no contact whatsoever from Direct General, Clem followed up with a March 12, 2010 letter alerting Direct General that he had filed suit against Direct General's insureds. The letter requested an explanation for

4

why, despite dozens of calls and letters from Direct General over the history of the claim, Direct General failed to respond to his time limit demand. The letter invited Direct General to provide the requested explanation "sometime next week." (Dkt. 46-26).

On March 25, 2010—*before responding to either of Clem's letters*—Direct General wrote a letter to its insureds advising them that "Brink and his counsel have been unwilling" to settle the claims against them. (Dkts. 46-27, 46-28). Direct General's letter did not reference Clem's demand. Notably, Direct General never forwarded Clem's February 19, 2010 and March 12, 2010 letters to its insureds.

On March 26, 2010, five weeks after the February 19, 2010 demand and two weeks after the March 12, 2010 follow up, Direct General responded to Clem. The March 26 letter did not provide any explanation for why Direct General had ignored Clem's time limit demand (as had been requested in Clem's March 12 letter), nor did the letter include the requested statement from the insured or agent. The March 26, 2010 letter attached the same disclosure package that Clem had now twice advised was incomplete. (Dkt. 46-29).

On April 14, 2010, Clem again wrote to Direct General requesting an explanation for why Direct General had failed to respond to his time limit demand, stating: "I would still appreciate receiving an explanation for why Direct General failed to settle this claim, so that I can share your explanation with my client. As you know, he is not an unforgiving person." (Dkt. 46-30).

On April 26, 2010, De Los Santos made an unsolicited visit to Direct General's Tampa office to express concern about the lawsuit because he had just been served. Direct General did not advise him of the February 19, 2010 time limit demand. Direct General

5

did not ask him to complete a statement regarding additional insurance. Instead, Direct General advised him that it had assigned an attorney to represent him in the lawsuit.

The case proceeded to trial and, after verdict and appeal, a judgment was entered in favor of Brink and against Pereles for $12,079,837.17 and against De Los Santos for $600,000.00, plus interest. Subsequently, Brink filed this action against Direct General for bad faith.

In addition to the facts outlined above, Brink's response in opposition relies on the opinion of his insurance expert, Daniel Doucette. Upon review of Direct General's claim handling, Doucette opined that Direct General failed to act in accordance with insurance industry custom and practice in its handling of the Brink claim by failing to respond to a time limit demand, failing to adequately communicate with its insureds, and failing to provide proper supervision of the employees handling the claim.

Now, Direct General moves for summary judgment.

## **SUMMARY JUDGMENT STANDARD**

Motions for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); Fed. R. Civ. P. 56(c). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law

6

applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248–49.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## **DISCUSSION**

Under Florida law, an insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 8 (Fla. 2018) (quoting

7

*Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). This means an insurer must act "diligently, and with the same haste and precision as if it were in the insured's shoes, work[ing] on the insured's behalf to avoid an excess judgment." *Id.* at 7. Failure to satisfy this duty means an insurer has acted in bad faith.

In considering whether an insurer satisfied its duty, the Florida Supreme Court listed several specific requirements an insurer must fulfill: (1) insurers must advise insureds of settlement opportunities; (2) insurers must advise insureds on the probable outcome of litigation; (3) insurers must warn insureds of the possibility of an excess judgment; and (4) insurers must advise insureds of steps they might take to avoid an excess judgment. *Boston Old Colony*, 386 So. 2d at 785. And "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Harvey*, 259 So. 3d at 7 (quoting *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. Dist. Ct. App. 1991)).

In determining whether an insurer acted in bad faith, the "totality of the circumstances" are considered. *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). The issue, therefore, "is whether, under all of the circumstances, the insurer could and should have settled the claim within the policy limits had it acted fairly and honestly toward its insured and with due regard for his interests." *Id.* at 679. Or, in other words, "the gravamen of what constitutes bad faith is whether under all the circumstances an insurer failed to settle a claim against an insured when it had a reasonable opportunity to do so." *Contreras v. U.S. Sec. Ins. Co.*, 927 So. 2d 16, 20 (Fla. Dist. Ct. App. 2006).

The Eleventh Circuit recently echoed *Harvey* in *Aldana v. Progressive Am. Ins. Co.*, 828 Fed. Appx. 663 (11th Cir. 2020). In *Aldana*, the Eleventh Circuit reversed this Court's order granting summary judgment in favor of the insurer, despite undisputed evidence that: (1) the claimant's attorney never responded to the insurer's repeated requests to schedule a global settlement conference; (2) the insurer followed up no less than five times with its insureds to retrieve requested financial affidavits; (3) the insurer sent eight (largely unanswered) letters to the claimant's attorney offering to globally tender the insureds' policy limits; and (4) the claimants never offered to settle their claims within the insureds' limits nor expressed a desire to do so. *See* 828 Fed. Appx. at 664-66. The Eleventh Circuit concluded there was sufficient evidence for a reasonable jury to find the insurer breached its good faith duties to its insureds. *Id.* at 670. Among other evidence, the Eleventh Circuit specifically cited the plaintiff's expert's testimony that the insurer had failed to "exercise the requisite care, diligence and prudence . . . in its handling of the claims." *Id.* at 671.

Here, there is sufficient evidence from which a reasonable jury may find Direct General failed to act in good faith as required under Florida law. Although, at the claim's outset, Direct General appeared willing to settle the claim, Direct General failed to provide Clem with the statement of insurance. Specifically, the record reflects that, beginning with his first letter in August 2008, Clem requested at least three times from Direct General a statement from its insureds or agent regarding additional insurance. Direct General sent one letter to its insureds requesting that *they* contact Brink's attorney to discuss any additional insurance, but Direct General never followed up to ensure that request was

9

completed.

Additionally, there is evidence that Direct General failed to inform its insureds of the possibility of an excess judgment until March 2010, nearly two years after the accident, even though Direct General determined in May 2008, that the claims were likely to exceed the limits.

Perhaps most important, when presented with a time limit demand to settle the claim, Direct General failed to timely respond and failed to advise its insureds of the February 19, 2010 settlement opportunity.

Direct General's motion largely focuses on Clem's failure to respond to Direct General's communications prior to Clem's February 2010 settlement demand but, as *Aldana* instructs, "the focus in a bad faith case is not on the actions of the claimant."  *Id.* at n.5 (quoting *Harvey*, 259 So. 3d at 7, 10-12).  Also, regardless of Direct General's settlement attempts early on, a jury could find that Direct General acted in bad faith when it failed to provide Clem with the additional insurance disclosure, failed to timely respond to Clem's time limit demand, and failed to adequately advise its insureds of the demand and the risk of an excess judgment.

Finally, as in *Harvey* and *Aldana*, Brink presented expert testimony that Direct General's handling of Brink's claims did not comply with applicable insurance industry custom and practice.  The Court concludes it is "for the jury to decide whether the insurer failed to act in good faith with due regard for the interests of the insured."  *Harvey*, 259 So. 3d at 7.

Accordingly, it is ORDERED AND ADJUDGED that:

1. Defendant's Motion for Summary Judgment (Dkt. 46) is denied.

2. Defendant's Motion for Leave to File a Reply (Dkt. 53) is denied as moot.

**DONE** and **ORDERED** in Tampa, Florida, this January 14, 2021

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record