UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DUSTIN C. BRINK,

    Plaintiff,

v.                                                Case No: 8:19-cv-2844-30AEP

DIRECT GENERAL INSURANCE
COMPANY,

    Defendant.
_____

## ORDER

THIS CAUSE is before the Court on Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for New Trial (Dkt. 191) and Plaintiff's Response in Opposition (Dkt. 201). The Court, having reviewed the motion, response, and being otherwise advised in the premises, concludes that the motion should be denied because the evidence—when viewed in a light most favorable to Plaintiff—was, by the thinnest of threads, sufficient for a reasonable jury to rule in Plaintiff's favor on his bad faith claim. Also, there is no basis to grant a new trial.

## BACKGROUND

How do you convert a $10,000 insurance policy into a $19,224,073.56 windfall? File a bad faith insurance action. This bad faith insurance action was tried before a jury on April 17, 2023, through April 20, 2023. On April 20, 2023, the jury ruled in favor of Plaintiff Dustin C. Brink and against Defendant Direct General Insurance Company. On April 28, 2023, Final Judgment was entered in Brink's favor in the amount of

$19,224,073.56.

Direct General has renewed its motion for judgment as a matter of law and also argues, in the alternative, that a new trial is warranted because: "(1) no reasonable jury could find bad faith based on the sufficiency of the record evidence; (2) Direct General was required to litigate at trial subject to the mercy of a partisan juror; and (3) Plaintiff's counsel made outrageous closing arguments." (Dkt. 191).

As discussed below, while the Court believes this case is a classic example of a contrived bad faith action, the Court's hands are tied because the jury weighed the totality of the circumstances and found bad faith. So, the Court must allow the verdict to stand. The Court also concludes that Direct General did not preserve its arguments regarding the alleged partisan juror and alleged "outrageous" statements made during Brink's closing arguments, so a new trial is not warranted.

## STANDARD OF REVIEW

Courts should grant judgment as a matter of law only "if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). Simply stated, "[u]nder Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004). When ruling on a Rule 50 motion, the court must refrain from invading the province of the jury: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

2

*Id.* at 1193 (internal citations omitted). Further, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

A Rule 59 motion for a new trial may be granted in the discretion of the trial court where "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict....Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great-not merely the greater-weight of the evidence." *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1186 (11th Cir. 2001). *See also Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940); *Montgomery v. Noga,* 168 F.3d 1282, 1295 (11th Cir.1999). A Rule 59 motion is not a forum to relitigate old matters or to present arguments or evidence that could have been presented at trial. *Michael Linet, Inc. v. Village of Wellington, Fla.,* 408 F.3d 757, 763 (11th Cir.2005).

## **DISCUSSION**

Direct General's first and main argument is that Brink presented insufficient evidence of bad faith. So the Court starts with the various definitions of bad faith. Under Florida law, an insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 8 (Fla. 2018) (quoting *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). But what does that really mean?

3

According to the Florida Supreme Court, this means an insurer must act "diligently, and with the same haste and precision as if it were in the insured's shoes, work[ing] on the insured's behalf to avoid an excess judgment." *Id.* at 7. Failure to satisfy this duty means an insurer has acted in bad faith.

In considering whether an insurer satisfied its duty, the Florida Supreme Court listed several specific requirements an insurer must fulfill: (1) insurers must advise insureds of settlement opportunities; (2) insurers must advise insureds on the probable outcome of litigation; (3) insurers must warn insureds of the possibility of an excess judgment; and (4) insurers must advise insureds of steps they might take to avoid an excess judgment. *Boston Old Colony*, 386 So. 2d at 785. And "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Harvey*, 259 So. 3d at 7 (quoting *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. Dist. Ct. App. 1991)).

In determining whether an insurer acted in bad faith, one must consider the "totality of the circumstances." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). The issue, therefore, "is whether, under all of the circumstances, the insurer could and should have settled the claim within the policy limits had it acted fairly and honestly toward its insured and with due regard for his interests." *Id.* at 679. Or, in other words, "the gravamen of what constitutes bad faith is whether under all the circumstances an insurer failed to settle a claim against an insured when it had a reasonable opportunity to do so." *Contreras v. U.S. Sec. Ins. Co.*, 927 So. 2d 16, 20 (Fla. Dist. Ct. App. 2006).

4

Unfortunately, determining what constitutes sufficient evidence of bad faith is anything but clear for a jury comprised of lay people. For example, in *Aldana v. Progressive Am. Ins. Co.*, 828 Fed. Appx. 663 (11th Cir. 2020), the Eleventh Circuit reversed this Court's order granting summary judgment in favor of the insurer, despite undisputed evidence that: (1) the claimant's attorney never responded to the insurer's repeated requests to schedule a global settlement conference; (2) the insurer followed up no less than five times with its insureds to retrieve requested financial affidavits; (3) the insurer sent eight (largely unanswered) letters to the claimant's attorney offering to globally tender the insureds' policy limits; and (4) the claimants never offered to settle their claims within the insureds' limits nor expressed a desire to do so. *See* 828 Fed. Appx. at 664-66. The Eleventh Circuit concluded there was still sufficient evidence for a reasonable jury to find the insurer breached its good faith duties to its insureds. *Id.* at 670. Among other evidence, the Eleventh Circuit specifically cited the plaintiff's expert's testimony that the insurer had failed to "exercise the requisite care, diligence and prudence . . . in its handling of the claims." *Id.* at 671.

While *Aldana* implies that an expert's conclusory opinion on whether a mistake constitutes bad faith is sufficient to create an issue of fact for the jury, other opinions from the Eleventh Circuit suggest that some facts of negligence or mistake in the handling of an insured's claim are insufficient to establish bad faith. *See Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1281 (11th Cir. 2021). In *Eres*, the Eleventh Circuit underscored that "some negligence" is not enough to support a finding of bad faith. *Id.* ("So too here— Eres has identified some ways that Progressive might improve its claims-processing

5

practice, but it isn't clear that Eres has shown negligence, let alone bad faith. On the undisputed facts, Eres has raised no possible inference of bad faith."); *see also Robles v. GEICO Indemnity Co.*, No. 20-14651, 2021 WL 4451971, at *4 (11th Cir. Sept. 29, 2021) ("These facts at worst show ways in which GEICO might improve processing claims—specifically when it comes to handling releases—in the future. The potential need to improve the process cannot be said to rise to the level of bad faith. Even if one were to view GEICO's conduct as imprudent, without more, its conduct falls short of demonstrating bad faith.").

The state of bad faith law has given rise to a cottage industry of sophisticated lawyers whose sole practice is to create bad faith cases out of simple mistakes. Such is the case here. As aptly described by Justice Wells in his dissent in *Berges*:

> [T]here are strategies which have developed in the pursuit of insurance claims which are employed to create bad faith claims against insurers when, after an objective, advised view of the insurer's claims handling, bad faith did not occur. This is a strategy which consists of setting artificial deadlines for claims payments and the withdrawal of settlement offers when the artificial deadline is not met. The goal of this strategy is to convert a policy purchased by the insured which has low limits of insurance into unlimited insurance coverage. . . . Perpetuating this kind of bad faith action is not only wrong on the basis of the claims handling . . . but is greatly detrimental to Florida's liability insurance consumers because of the increases in their insurance costs. . . . [W]hile bad faith claims based upon substantive wrongful acts by an insurer are a useful part of insurance regulation, such claims must be carefully screened by the courts so that only real-rather than created-bad faith claims provide a basis for a bad faith recovery of damages against an insurer. . . . It is the Court's responsibility to have logical, objective standards for bad faith and not to avoid setting definitive standards by declaring bad faith to be a jury question. The Court should recognize that it has the responsibility to reserve bad faith damages, which is limitless, court-created insurance, to egregious circumstances of delay and bad faith acts. The Court likewise has a responsibility to not allow contrived bad faith claims that are the product of sophisticated legal strategies and not the product of actual bad faith.

*Berges*, 896 So. 2d at 685-87 (Wells, J., dissent).

Direct General argues that the instant case is a "quintessential set-up" against Direct General to manufacture a bad faith clam and obtain a hefty recovery on a $10,000 insurance policy—the very scenario Justice Wells addressed in *Berges*. *See also Noonan v. Vt. Mut. Ins. Co.*, 761 F. Supp. 2d 1330, 1336 (M.D. Fla. Nov. 15, 2010) (granting carrier's motion for summary judgment due to plaintiff's set-up actions, noting that "Plaintiffs' counsel sought to convert Robbins' $100,000 insurance policy into a $1,450,000.00 windfall. Such is not the purpose of a bad faith claim."). The Court agrees with Direct General. The Court believes that, from the onset, this case was never going to settle. Indeed, during the prior appeal of this case, Justice Anderson made the same observation in his concurring and dissenting opinion: "overwhelming evidence indicates that no settlement was possible in this case because Brink's counsel clearly did not want to settle . . . [the evidence] shows that Brink's counsel tried to lure Direct General into making mistakes that he could later use to generate a bad faith claim."  (Dkt. 125 at pp. 46-47).

That said, the jury was presented with evidence that Direct General adjuster Sheila Moore failed to timely respond to the February 19, 2010, letter from Plaintiff's personal injury attorney Alexander Clem. Moore calendared March 11, 2010, for a follow-up, but before she could do so, she received Clem's March 12, 2010, correspondence advising that suit had been filed against Direct General's insureds. The Court views Moore's failure as an isolated instance of negligence, particularly in light of Direct General twice sending a check for the $10,000 policy limits prior to the February 19, 2010, letter. In fact, Plaintiff's counsel had the $10,000 check in his possession at the time he sent the February

7

19, 2010, letter. But the evidence included the opinion of Brink's insurance expert, Daniel Doucette, who testified that Direct General acted in bad faith. Specifically, Doucette opined that Direct General failed to act in accordance with insurance industry custom and practice in its handling of the Brink claim by failing to respond to a time limit demand [and] failing to adequately communicate with its insureds.

As the Court said at the beginning, the Court's hands are tied because the jury was entitled to interpret the insurance adjuster's mistake of not responding to the time sensitive demand (i.e., within fourteen days) as bad faith, especially when they were presented with Doucette's opinion. In other words, the Court cannot take the place of the jury even though the Court disagrees with their finding. *See Harvey*, 259 So. 3d at 1, 5, 10-11 (relying in part on the expert opinion testimony of Mr. Doucette to conclude there was sufficient evidence of bad faith and that directed verdict should not have been granted). For these same reasons, a new trial is not warranted because the evidence was sufficient to support the jury's verdict.

To be sure, there are legitimate bad faith claims, but this cottage industry riddles the judiciary with countless manufactured claims. In addition to the law being nebulous on what constitutes bad faith as the Court already touched upon above, the parties are allowed to cherry-pick a jury instruction for bad faith from countless cases that attempt to describe it. This allows the attorneys to take poetic license in order to find the best language to advocate their positions and opens the door to error on appeal because the law lacks clarity and consistency. Indeed, this Court was already reversed once in this case because the standard jury instruction for bad faith was not specific enough.

8

The existing state of bad faith law confuses the jury and invites error. For example, it is difficult for a jury to discern a mistake from negligence from bad faith. Here, Brink's attorneys presented the jury with a number of innocent mistakes that had nothing to do with the bad faith analysis, like sending correspondence to the wrong address, even though the insureds were already aware of the communications, and not going above and beyond to ensure that the insureds were understanding the communications. These matters are not responsibilities of the insurance company, yet a plaintiff's attorney may present them in such a way to muddy the waters and confuse. At the end of the day, how can a jury glean the material facts from the immaterial, especially when the case law is unable to articulate a clear definition of bad faith, let alone a standard jury instruction. Trial courts cannot act as appropriate gatekeepers when the boundaries are so poorly defined.

As previously stated, there are legitimate bad faith cases, but this case is not one of them. Indeed, the evidence showed that Clem associated another law firm specializing in bad faith cases before ever contacting Direct General about his representation—from which one can clearly infer a plan to pursue a bad faith case against Direct General from the get-go.[1] In the eighteen months before Clem's February 19, 2010, letter, Direct General telephoned Clem approximately thirty times and sent correspondence to him (including the

---

[1] Indeed, and as Direct General points out in its motion: "Clem's firm was retained by Plaintiff in a flatly nonstandard contingency agreement—executed only three months after the subject accident—in which Plaintiff also retained his present bad-faith counsel's firm. The agreement provided that there would be no fee owing to either firm if Brink's recovery did not exceed $85,000—which just so happened to be the total amount of the Direct General $10,000 bodily injury coverage and Shelter Insurance's $75,000 UM coverage. In other words, the only way either firm could recover any money is if there were a bad faith action premised on an excess judgment." (Dkt. 191 at p.14).

tenders of the policy limits) over twenty times. Clem never responded to these communications, which is unprofessional and dilatory. *See Barnard v. Geico Gen. Ins. Co.*, No. 5:10CV213/RS-CJK, 2011 WL 2039560, at *3 (N.D. Fla. May 25, 2011), *aff'd*, 448 F. App'x 940 (11th Cir. 2011) ("For an attorney to refuse to respond to attempts to contact him for months at a time is outrageous and unprofessional . . . Thus, Plaintiff cannot now use her own attorney's poor behavior to claim bad faith on the part of Defendant.").

To reiterate Justice Anderson, Plaintiff's counsel "were planning a bad faith claim from the very beginning, even before the first communication from Brink's counsel to Direct General." (Dkt. 125 at p.48). This case was never going to settle. And yet, the jury was entitled to find bad faith because Brink was able to find an expert willing to conflate mistakes with bad faith. Accordingly, the Court concludes it cannot take the verdict away under these circumstances.

Having discussed Direct General's main argument, the Court concludes that Direct General's second and third arguments in favor of a new trial fail because these matters were not preserved. Brink aptly points out the flaws in Direct General's second and third arguments and the Court denies this portion of Direct General's motion for the reasons stated in the response and will therefore keep this analysis succinct.

To briefly summarize, Direct General argues that a new trial is warranted because a juror was biased against Direct General. The only evidence of this alleged bias is that during the direct examination of Direct General's expert witness Kathy Maus, a juror—who turned out to be the jury foreperson—submitted the following question: "Why is it that a judge can tell an attorney how to restate a question so that the opposing attorney

doesn't object? Is this not bias?" While this question may imply that the juror favored the Plaintiff before hearing all the evidence, Direct General did not object to her continued presence on the jury. Nor did it express any issue, one way or the other, with the question. A party "cannot wait to hear the verdict before contesting the impartiality of the jury and then attack the court's refusal to investigate his allegation." *United States v. Edwards*, 696 F.2d 1277, 1282 (11th Cir. 1983). While the question was unusual, it does not warrant a new trial.

Notably, when the Court discussed the question with counsel, Direct General's counsel described the question as "an innocent question of procedure." (Dkt. 184, Vol. III of IV, p.478). Moreover, when the Court indicated how it was going to answer the question, Direct General's counsel did not object – on the contrary, counsel stated "I concur." (Dkt. 184, Vol. III of IV, p.479).

Finally, Direct General argues that the Court should grant a new trial based upon the improper comment of Plaintiff's counsel during closing argument. Remarking on the testimony of Direct General's expert, Kathy Maus, counsel stated: "Of course, [Direct General] brought Kathy Maus as their expert. . . . Ms. Maus has spent her entire life in service to the insurance industry. She is committed to their cause. She is a registered lobbyist for the insurance industry in Tallahassee. I don't know that she's the right person who can give an objective opinion about whether Direct General – her firm does anything that insurance industry needs." (Dkt. 184:148-49). This argument fails because Direct General's counsel did not object and the Court does not see any plain error sufficient to warrant ordering a new trial associated with the comments.

11

Accordingly, it is ORDERED AND ADJUDGED that:

1. Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for New Trial (Dkt. 191) is denied.

2. If Defendant intends to appeal this Order, the Court will entertain a motion to stay the remaining matters of attorney's fees and costs.

**DONE** and **ORDERED** in Tampa, Florida, this July 14, 2023.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record